1
2
3
4
5
6
7
8
9
10

# UNITED STATES DISTRICT COURT

11

## EASTERN DISTRICT OF CALIFORNIA

12  FERNANDO GUIZAR,                          )   1:11-cv-00962 AWI MJS HC
                                             )
13                       Petitioner,         )
                                             )
14        v.                                 )   FINDINGS AND RECOMMENDATION
                                             )   REGARDING RESPONDENT'S MOTION
15                                           )   TO DISMISS
                                             )
    CONNIE GIPSON,                           )   [Doc. 11]
16                                           )
                         Respondents.        )
17  _____)

18
19          Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus

20  pursuant to 28 U.S.C. § 2254. Respondent, Connie Gipson, as warden of California State

    Prison - Corcoran, is hereby substituted as the proper named respondent pursuant to Rule
21
    25(d) of the Federal Rules of Civil Procedure. Respondent is represented in this action by
22
    Brian G. Smiley, Esq., of the Office of the Attorney General for the State of California.
23
24  I.      **BACKGROUND**

25          Petitioner is currently in the custody of the California Department of Corrections

26  pursuant to a judgment of the Superior Court of California, County of Madera, upon being

    convicted by a jury of second degree murder, willful discharge of a firearm at a vehicle and
27
28

1   four counts of attempted murder. (See LD No. 1.[1]) On September 7, 1995, Petitioner was

2   sentenced to serve an indeterminate term of forty-one years to life. (Id.) On June 9, 1997, the

3   California Court of Appeal, Fifth Appellate District, affirmed the judgment. (LD 2.)

4       Petitioner proceeded to file three petitions for writ of habeas corpus in the California

5   state courts starting on July 17, 2009.[2] On June 8, 2011[3], Petitioner filed the present federal

6   habeas corpus petition. (Pet., ECF No. 1.) On November 28, 2011, Respondent filed a motion

7   to dismiss the petition as being filed outside the one-year limitations period prescribed by 28

8   U.S.C. § 2244(d). Petitioner filed an opposition to the motion on January 5, 2012. (Opposition,

9   ECF No. 16.) Respondent filed a reply on March 13, 2012, and requested permission to lodge

10  supplemental documents on April 2, 2012. (Reply, ECF No. 21; Request, ECF No. 24.)

11  **II.    DISCUSSION**

12      **A.    Procedural Grounds for Motion to Dismiss**

13      Rule 4 of the Rules Governing Section 2254 Cases allows a district court to dismiss a

14  petition if it "plainly appears from the petition and any attached exhibits that the petitioner is

15  not entitled to relief in the district court . . . ." Rule 4 of the Rules Governing Section 2254

16  Cases.

17      The Ninth Circuit has allowed respondents to file a motion to dismiss in lieu of an

18  answer if the motion attacks the pleadings for failing to exhaust state remedies or being in

19  violation of the state's procedural rules. See, e.g., O'Bremski v. Maass, 915 F.2d 418, 420 (9th

20  Cir. 1990) (using Rule 4 to evaluate motion to dismiss petition for failure to exhaust state

21

22      [1] "LD" refers to the documents lodged by Respondent in support of his motion to dismiss.

23      [2] In Houston v. Lack, the Court held that a pro se habeas petitioner's notice of appeal is deemed filed on
    the date of its submission to prison authorities for mailing, as opposed to the date of its receipt by the court clerk.
24  487 U.S. 266, 276, 108 S.Ct. 2379, 2385 (1988).  The Ninth Circuit has applied the rule to assess the timeliness
    of federal habeas filings under the AEDPA limitations period.  Huizar v. Carey, 273 F.3d 1220, 1222, (9th Cir.
25  2001), citing Houston, 487 U.S. 266, 276, 108 S.Ct. at 2385. Under the mailbox rule, the Court deems petitions
    filed on the date Petitioner presumably handed his petition to prison authorities for mailing. See also Rule 3(d) of
26  the Rules Governing Section 2254 Cases. Even though the petition was filed on July 22, 2009, the petition shall
    be considered filed on July 17, 2009, the date of mailing.

27
      [3] While the petition was filed on June 14, 2011, it shall be considered filed on June 8, 2011, the date of
28  mailing.

1 remedies); <u>White v. Lewis</u>, 874 F.2d 599, 602-03 (9th Cir. 1989) (using Rule 4 as procedural

2 grounds to review motion to dismiss for state procedural default); <u>Hillery v. Pulley</u>, 533 F.Supp.

3 1189, 1194 & n. 12 (E.D. Cal. 1982) (same).  Thus, a respondent can file a motion to dismiss

4 after the court orders a response, and the Court should use Rule 4 standards to review the

5 motion.  See <u>Hillery</u>, 533 F. Supp. at 1194 & n. 12.

6       In this case, Respondent's motion to dismiss is based on a violation of the one-year

7 limitations period. 28 U.S.C. § 2244(d)(1).  Because Respondent's motion to dismiss is similar

8 in procedural standing to a motion to dismiss for failure to exhaust state remedies or for state

9 procedural default and Respondent has not yet filed a formal answer, the Court will review

10 Respondent's motion to dismiss pursuant to its authority under Rule 4.

11 **B.    Commencement of Limitations Period Under 28 U.S.C. § 2244(d)(1)(A)**

12       On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act

13 of 1996 (hereinafter "AEDPA").  The AEDPA imposes various requirements on all petitions for

14 writ of habeas corpus filed after the date of its enactment.  <u>Lindh v. Murphy</u>, 521 U.S. 320, 117

15 S.Ct. 2059, 2063 (1997); <u>Jeffries v. Wood</u>, 114 F.3d 1484, 1499 (9th Cir. 1997) (en banc),

16 *cert. denied,* 118 S.Ct. 586 (1997).

17       In this case, the petition was filed on June 8, 2011, and therefore, it is subject to the

18 provisions of the AEDPA.  The AEDPA imposes a one-year period of limitation on petitioners

19 seeking to file a federal petition for writ of  habeas corpus.  28 U.S.C. § 2244(d)(1).  As

20 amended, § 2244, subdivision (d) reads:

21       (1)  A 1-year period of limitation shall apply to an application for a writ of
habeas corpus by a person in custody pursuant to the judgment of a State court.
22 The limitation period shall run from the latest of –

23       (A) the date on which the judgment became final by the conclusion of
direct review or the expiration of the time for seeking such review;
24

25       (B) the date on which the impediment to filing an application created by
State action in violation of the Constitution or laws of the United States is
removed, if the applicant was prevented from filing by such State action;
26

27       (C) the date on which the constitutional right asserted was initially
recognized by the Supreme Court, if the right has been newly recognized by the
Supreme Court and made retroactively applicable to cases on collateral review;
28 or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d).

Under § 2244(d)(1)(A), the limitations period begins running on the date that the Petitioner's direct review became final or the date of the expiration of the time for seeking such review. In this case, Petitioner filed an appeal with the California Court of Appeal, Fifth Appellate District. The court issued a decision affirming the judgment on June 9, 1997. (LD No. 2.) The Court of Appeal's decision became final on July 9, 1997, thirty days after filing. See Cal. Rules of Court 8.264 (formerly Rule 24). Petitioner did not seek review in the California Supreme Court. Accordingly, for purposes of § 2244(d)(1)(A), Petitioner's judgment of conviction became final on July 19, 1997, upon expiration of the ten-day period within which to file and serve a petition for review with the California Supreme Court. See Cal. Rules of Court 8.500 (formerly Rule 28). The AEDPA statute of limitations began to run the following day, on July 20, 1997. Patterson v. Stewart, 251 F.3d 1243, 1246 (9th Cir. 2001).

Petitioner would have one year from July 20, 1997, absent applicable tolling, in which to file his federal petition for writ of habeas corpus. However, Petitioner delayed in filing the instant petition until June 8, 2011, over a decade after the statute of limitations period expired. Absent the later commencement of the statute of limitations or any applicable tolling, the instant petition is barred by the statute of limitations.

**C.     Later Commencement of Limitations Period Under 28 U.S.C. § 2244(d)(1)(D)**

28 U.S.C. § 2244(d)(1)(D) states that the limitations period shall run from "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." The objective standard in determining when time begins to run under Section 2244(d)(1)(D) is "when the prisoner knows (or through diligence could discover) the important facts, not when the prisoner recognizes their legal significance."

Hasan v. Galaza, 254 F.3d 1150 (9th Cir. 2001), (quoting Owens v. Boyd, 235 F.3d 356, 359 (7th Cir. 2000)). "Section 2244(d)(1)(D) does not demand the maximum diligence possible, but only 'due' or 'reasonable' diligence." Souliotes v. Evans, 622 F.3d 1173, 1178 (9th Cir. 2010) (reversed on other grounds) (citing Starns v. Andrews, 524 F.3d 612, 618-19 (5th Cir. 2008); Wilson v. Beard, 426 F.3d 653, 660-62 (3d Cir. 2005); Moore v. Knight, 368 F.3d 936, 939-40 (7th Cir. 2004); Wims v. United States, 225 F.3d 186, 190 n.4 (2d Cir. 2000)); see also Holland v. Florida, 130 S. Ct. 2549, 2565 (2010); Mathis v. Thaler, 616 F.3d 461, 474 (5th Cir. 2010); DiCenzi v. Rose, 452 F.3d 465, 470 (6th Cir. 2006).

Petitioner presents two arguments for statutory tolling of the commencement of the statute of limitations period. First, he asserts that he first became aware of the one year statute of limitations in September, 2008 when speaking to another inmate. (Opposition, ECF No. 16, at 7.) At that time, Petitioner then began to research issues regarding bullet trajectory issues and obtained an expert to review the forensic evidence presented at trial. (Id.) Petitioner's expert disagreed with the findings of the prosecution's expert at trial and concluded that the bullets ricocheted off of the asphalt before entering the victim's vehicle. (Id.) Petitioner attached the experts signed declaration to his federal petition. (See Pet., ECF No. 1-1 at 10-31.)

Second, Petitioner asserts that in January, 2009 he learned that a prosecution witness, Alfonzo Borjorquez Verdugo ("El Pelon"), was wanted for murder in Mexico at the time he testified against Petitioner. (Opposition, ECF No. 16, at 8.) Petitioner attached a copy of what he asserts to be an authentic notarized document from Mexican law enforcement establishing that Verdugo was wanted for the 1988 murder of Filipe DeJesus Gota Galves. (Pet., ECF No. 1 at 114-150, ECF No. 1-1 at 1.)

1.    Facts Underlying Petitioner's Conviction

In order to better address Petitioner's claims of discovery of a new factual predicate, a description of the facts of the underlying offense shall be provided.[4]

---

[4] The factual background is taken from the opinion of the state appellate court and is presumed correct. 28 U.S.C. § 2254(e)(1).

On September 23, 1993, at approximately 9 p.m., teenagers Mark Goodin, Joseph Burns, Lindsay Hempel, Kevin Westerberg, and Andrew Patton were in a car driving to a party in Madera. Burns, the driver, mistakenly turned off Avenue 7 in Madera County onto Road 33 ½ instead of Road 30 as he intended. When he realized his mistake, Burns drove into a private compound at the end of the road and made a U-turn. While heading back toward Avenue 7 on Road 33 ½, Burns pulled over to review his directions. Some of the passengers took the opportunity to get out of the car, urinate, and get a beer from a cooler in the trunk. The driver was not drinking.

While the teenagers' car was stopped, another vehicle was seen leaving the private compound. The other vehicle, with its high beam headlights on, stopped approximately 200 feet behind the teenagers' car. The other vehicle's headlights illuminated the teenagers' car.

As the last person, Mark Goodin, reentered the teenagers' car, the passengers could hear gunshots coming from the other vehicle. Approximately 15 - 20 Shots were fired at the teenagers' car in rapid succession. Upon hearing the shots, the teenagers all ducked down in their car and Burns accelerated in order to leave the area as quickly as possible. Some of the teenagers looked back as the drove away and saw one spark on the ground. Several more shots were fired as the teenagers' car drove off. The teenagers were unable to see the driver of the other vehicle or to get a good look at the vehicle because of the blinding headlights.

From the location where the other people stopped, 24 shots were fired in the direction of the teenagers' car. The recovered bullets and shell casings indicated that the bullets were .22 or .30 caliber, copper-jacketed steel slugs of the type used in an assault weapon such as the AK-47. The weapon that fired the shots was not recovered. The Madera County Sheriff's Department was able to determine from the tire tracks and the location of shell casings that the other vehicle traveled at least 70 feet in pursuit of the teenagers' car.

Two of the bullets struck the teenagers' car. One lodged in the bumper and one traveled through the truck lid, ice chest, and back seat before entering mark Goodin's body and traveling through his spleen, left lung and aorta. Mark Goodin died at approximately 9:30 p.m. as a result of these wounds. After discovering that Goodin had been shot, the teenagers drove toward Fresno, stopping off at Herndon Avenue to call for assistance.

A criminalist testified that it would have been almost impossible for the two bullets to have ricocheted off the road before hitting the car. There was also no indication on the bulleted fragments themselves that the bullets had ricocheted.

...

Police investigators interviewed Guizar on October 29, 1993. At that time, Guizar was informed that he was a suspect and that the investigators would be interviewing his girlfriend on November 2, 1993. A tire tread mark from the other vehicle was found where the shooting occurred, and investigators also planned to compare the thread marks of Guizar's vehicles with the imprint. When they arrived at Guizar's home on November 2, the investigators discovered that Guizar had not shown up for work, he and his family were gone, and they had left behind furniture, vehicles, and his last paycheck. They also noticed that the

tires on one of Guizar's vehicles, a pick-up truck, appeared to have been changed after the night of the shooting.

Alfonso Borjorquez (hereafter "Borjorquez") gave Guizar and his family a ride to Indo, California on October 30, 1993, at Guizar's request. During the trip, Guizar told Borjorquez that he was leaving Madera because he had killed a person on Road 30 ½. Guizar also told Borjorquez that his brother, Uriel Guizar (hereafter "Uriel" to distinguish him from defendant ), had made the weapon "disappear." Guizar carried with him all his money, specifically $3,700, when he left for Indio. Borjorquez also testified that he had agreed to cooperate with the prosecution as part of a plea agreement under which Borjorquez admitted he had been an accessory after the fact.

On cross-examination, defense counsel asked whether Borjorquez had come to this country illegally; the prosecutor's objection to the question was sustained. Defense counsel then asked whether Borjorquez had ever told Guizar that he had shot and killed someone in Mexico; again, the prosecutor's objection was sustained.

(LD 2 at 3-6.)

### 2.    Expert Opinion Regarding Ricochet

Petitioner provides declarations dated on October 7, 2008 and November 3, 2008 from James L. Norris, a criminalist, who reviewed the ballistics evidence from the trial. (ECF No. 1-1 at 10-31.) Norris concluded, that in his opinion, the shots were fired from a high powered rifle from approximately 190 feet behind the vehicle and two shots ricocheted off the roadway, causing sparks and then entered the rear of the vehicle at an upward angle. (Id.) The opinion of Norris directly contradicts the testimony of the prosecution's criminalist, John Hamman, who testified at trial that it was unlikely that the bullets ricocheted off the roadway before entering the vehicle. (Id.)

While Petitioner did not obtain an expert opinion to testify at trial, defense counsel cross-examined Hamman regarding his opinion that it was unlikely that the bullets ricocheted. (See Rptr's Tr., LD 11 at 359-363, 367.) Moreover, defense counsel argued during closing arguments that Hamman's opinion was wrong and the bullet must have ricocheted:

So either the shooter was laying on the ground in the prone position just a little bit behind the car and pointing up at the back of the car, or he was, as the victims testified, a hundred or so yards away shooting from a vehicle. You can't have that happen without a ricochet. If he's back there where the victims placed the gunman, there has to be a ricochet.

1   (Rpt'rs Tr. at 1357-58.)

2        While the opinion of Petitioner's expert had not been obtained at the time of trial,

3   Petitioner was not diligent in obtaining the evidence. Petitioner knew of the ricochet theory and

4   argued it at trial. He has not provided any reason why he could not have obtained a ballistics

5   opinion earlier. He has not shown that the ballistics evidence has only become discoverable

6   through advancements in science or that critical evidence was withheld. In fact, Norris critiques

7   Hamman's trial testimony regarding ricochet by explaining that a scientific journal article

8   published in September 1992, before the shooting occurred, discussed the relevant state of

9   bullet ricochet science. (See ECF No. 1-1 at 19-25; T.W. Burke et al., Bullet Ricochet: A

10  Comprehensive Review, Journal of Forensic Sciences, Vol. 37, No. 5. (1992).) Norris attached

11  a copy of the article to his declaration. (Id.)

12       Accordingly, Petitioner provides no reason why he could not have obtained such a

13  scientific opinion at the time of trial. As Petitioner was not diligent in obtaining the expert

14  opinion, it does not serve to toll the commencement of the statute of limitations under 28

15  U.S.C. § 2244(d)(1)(D).

16            3.     Evidence That Borjorquez Verdugo[5] was Wanted for Murder in Mexico

17       Petitioner also argues for the later commencement of the statute of limitations based

18  on his discovery in March 2009 of allegedly authentic Mexican documentation that Verdugo

19  was wanted for murder at the time he testified against Petitioner. (See Opp'n. at 3.) Petitioner's

20  claim fails. At trial, defense counsel attempted to cross-examine Verdugo regarding the

21  murder. (Rpt'rs Tr. at 384.) Petitioner appealed the trial court's decision to deny the evidence

22  on relevance grounds, and the California Court of Appeal, Fifth Appellate District denied the

23

24       _____

25       [5] The California Court of Appeal, Fifth Appellate District refers to Borjorquez Verdugo as "Borjorquez" whereas Respondent refers to him as "Verdugo." All future references to Borjorquez Verdugo shall be as "Verdugo."

26

27

28

1   claim. (LD 2 at 13-18.) Although Petitioner did not obtain a copy of Mexican documents, he

2   was aware that Verdugo was potentially wanted for murder at trial and tried to raise the issue

3   at that time. Petitioner has not presented any reason why he could not have attempted to

4   obtain documentation from the relevant Mexican authorities at the time of trial.

5       Accordingly, Petitioner is not entitled to the later commencement of the statute of

6   limitations as the information was known at the time of trial, and Petitioner has not shown that

7   he was diligent in discovering the new evidence.

8       **D.      Tolling of the Statute of Limitations Period During State Court Appeals**

9       28 U.S.C. § 2244(d)(2) states that the "time during which a properly filed application for

10  State post-conviction or other collateral review with respect to the pertinent judgment or claim

11  is pending shall not be counted toward" the one year limitation period.  28 U.S.C. § 2244(d)(2).

12  In Carey v. Saffold, the Supreme Court held the statute of limitations is tolled where a

13  petitioner is properly pursuing post-conviction relief, and the period is tolled during the intervals

14  between one state court's disposition of a habeas petition and the filing of a habeas petition

15  at the next level of the state court system. 536 U.S. 214, 216 (2002); see also Nino v. Galaza,

16  183 F.3d 1003, 1006 (9th Cir. 1999), *cert. denied,* 120 S.Ct. 1846 (2000). Nevertheless, state

17  petitions will only toll the one-year statute of limitations under § 2244(d)(2) if the state court

18  explicitly states that the post-conviction petition was timely or was filed within a reasonable

19  time under state law. Pace v. DiGuglielmo, 544 U.S. 408 (2005); Evans v. Chavis, 546 U.S.

20  189 (2006). Claims denied as untimely or determined by the federal courts to have been

21  untimely in state court will not satisfy the requirements for statutory tolling. Id.

22      Here, the statute of limitations began to run on July 20, 1997. According to the state

23  court records provided by Respondent, Petitioner filed his first petition for collateral relief, in

24  the form of a petition for writ of habeas corpus, in July 2009. (LD 3.) This filing occurred over

25  a decade after the limitations period expired on July 21, 1998. State petitions filed after the

26

27

28

1  expiration of the statute of limitations period shall have no tolling effect. Ferguson v.

2  Palmateer, 321 F.3d 820 (9th Cir. 2003) ("section 2244(d) does not permit the reinitiation of

3  the limitations period that has ended before the state petition was filed.").

4      Accordingly, the limitations period began on July 20, 1997, and expired on July 21,

5  1998. The present petition was filed on June 8, 2011, over twelve years after the expiration

6  of the year statute of limitations period. The instant federal petition is untimely.

7      **E.**    **Equitable Tolling**

8      The limitations period is subject to equitable tolling if the petitioner demonstrates: "(1)

9  that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance

10  stood in his way." Holland v. Florida, 130 S. Ct. 2549, 2560-62 (2010); quoting Pace v.

11  DiGuglielmo. Petitioner bears the burden of alleging facts that would give rise to tolling. Pace,

12  544 U.S. at 418; Hinton v. Pac. Enters., 5 F.3d 391, 395 (9th Cir.1993). Petitioner presents

13  five grounds for equitable tolling based on: (1) Petitioner's limited English skills, (2) Petitioner's

14  lack of skill in the law, (3) Petitioner's placement in administrative segregation, (4) Petitioner's

15  mental incompetence, and (5) the failure of Petitioner's attorney to perform competently. The

16  Court shall address Petitioner's claims in turn.

17      1.    Limited Knowledge of the English Language

18      Petitioner contends he should be granted equitable tolling because he is illiterate and

19  was not provided adequate legal assistance for a non-English speaker. (ECF No. 9 at 9.) In

20  Mendoza v. Carey, 449 F.3d 1065, 1069-71 (9th Cir. 2006), the Ninth Circuit held that a

21  non-English speaking petitioner may be entitled to equitable tolling if he can demonstrate that

22  he was unable, despite diligent efforts, to procure legal materials in his language or to obtain

23  translation assistance. However, in Pace v. DiGuglielmo, the Supreme Court made clear the

24  requirement that equitable tolling is only available if the petitioner demonstrates that he acted

25  diligently. 544 U.S. at 418. In order to show diligence, he must provide details of any specific

26

27

28

1   actions he took toward the filing of the petition. <u>Arthur v. Allen</u>, 452 F.3d 1234, 1253 (11th Cir.

2   2006), opinion modified on reh'g, 459 F.3d 1310 (11th Cir. 2006). Additionally, he "bears a

3   strong burden to show specific facts to support his claim of extraordinary circumstances and

4   due diligence." <u>Brown v. Barrow</u>, 512 F.3d 1304, 1307 (11th Cir. 2008). In this case, Petitioner

5   fails to demonstrate that he acted diligently. His only assertion is a statement that he is

6   illiterate with very little understanding of English. Petitioner fails to state with specificity any

7   actions he took to mitigate his language deficiency. His conclusory claim is insufficient to

8   satisfy his burden of demonstrating he acted diligently.

9       Furthermore, institutional records indicate that Petitioner was capable of reading and

10   writing in English. His educational records show that he obtained his GED – via an English

11   administered test - on April 18, 1995,and that he scored above the required standard in his

12   writing skills. (LD 12 at 1.) On May 3, 1996, his reading skills were rated as twelfth grade, ninth

13   month, and his language skills were rated at eleventh grade, eighth month. (<u>Id.</u> at 2.) On June

14   30, 1996, his educational instructor noted that Petitioner "appears to have a good educational

15   background . . . ." (<u>Id.</u> at 3.) On December 31, 1997, his General Purpose Language (GPL)

16   score was still noted to be at the twelfth grade, ninth month level. (<u>Id.</u> at 4.) During the relevant

17   limitations period, institutional staff noted on administrative segregation paperwork dated

18   February 11, March 9, and December 28, 1998, that Petitioner was not illiterate and did not

19   require a staff assistant. (LD 13.)

20       Petitioner fails to show that his English language skills were lacking, and is not entitled

21   to equitable tolling.

22       2.   <u>Ignorance of the Law</u>

23       Petitioner also claims he should be entitled to equitable tolling because he is

24   uneducated and does not have knowledge of the law. This claim for equitable tolling must also

25   fail. <u>Raspberry v. Garcia</u>, 448 F.3d 1150, 1154 (9th Cir. 2006) (pro se lack of legal

26   sophistication is not an extraordinary circumstance warranting equitable tolling); <u>Turner v.</u>

27   <u>Johnson</u>, 177 F.3d 390, 392 (5th Cir. 1999), (inmate's lack of legal training, a poor education,

28   or illiteracy does not give a court reason to toll the limitations period); <u>Shoemate v. Norris</u>, 390

1    F.3d 595, 598 (8th Cir. 2004); Marsh v. Soares, 223 F.3d 1217, 1220 (10th Cir. 2000).

2    Petitioner's circumstances are no different than the majority of incarcerated prisoners

3    attempting to file petitions for writ of habeas corpus. Accordingly, his ignorance of the law is

4    not an extraordinary circumstance entitling Petitioner to equitable tolling.

5                     3.      Placement in Administrative Segregation

6          Petitioner claims that he was unable to timely file his petition due to his placement in

7    administrative segregation and lack of access to his legal files. Placement in administrative

8    segregation is not extraordinary and do not warrant equitable tolling. See Ramirez v. Yates,

9    571 F.3d 993, 998 (9th Cir. 2009). However, the Ninth Circuit has recognized that a petitioner's

10   separation from his file and transcripts may provide a basis for equitable tolling. Id. (a complete

11   lack of access to a legal file may constitute an extraordinary circumstance); United States v.

12   Battles, 362 F.3d 1195, 1197 (9th Cir. 2004) (equitable tolling may be allowed if counsel

13   withheld transcripts during limitations period).

14         Petitioner was placed in administrative segregation at Salinas Valley State Prison on

15   February 11, 1998. (Pet. at 106; Mot., ECF No. 2 at 9.) Petitioner asserts that from the time

16   he was placed in segregation, until when he was transferred to administrative segregation at

17   a different prison in March of 1999, he did not have access to his legal files. In further support

18   of this claim, Petitioner provided the Court with a copy of an inmate request for interview form

19   submitted on April 4, 1998 in which he requested his legal files from the property officer. (ECF

20   No. 24 at 4.) On April 14, 1998, the request was denied as follows: "Denied. IGI [Institutional

21   Gang Investigations] has the legal materials." Petitioner has made a plausible showing that

22   he was not provided with his legal files during the duration of the statute of limitations period.

23   (Id.)

24         Respondent, on the other hand, argues that Petitioner nevertheless is not entitled to

25   tolling because it was Petitioner's own behavior that caused him to be separated from his legal

26   files. (Reply, ECF No. 21 at 11.) Respondent provides no relevant Supreme Court or Ninth

27   Circuit authority, but instead relies on Second Circuit authority that would directly contravene

28   the relevant Ninth Circuit holding in Ramirez. (Compare  Hizbullahankhamon v. Walker, 255

F.3d 65 (2d Cir. 2001) and <u>Valverde v. Stinson</u>, 224 F.3d 129, 133 n.3 (2d Cir. 2000) ("A petitioner's own behavior . . . may of course fatally undermine his claim that 'rare and extraordinary' or 'exceptional' circumstances warrant equitable tolling."), <u>with</u> <u>Ramirez</u>, 571 F.3d 998 ("[W]e have previously held that a complete lack of access to a legal file may constitute an extraordinary circumstance..."). The Court shall not adopt the legal authority proposed by Respondent in this case.

Respondent further argues that relevant institutional authority allows inmates in administrative segregation to access their legal files by filling out the appropriate form. (Reply at 12.) However, despite such authority, Petitioner has provided evidence that he was denied his records upon request.

Finally, this Court is reluctant to follow Second Circuit authority and deny Petitioner the opportunity to seek federal habeas review of his underlying conviction based on subsequent conduct while incarcerated.

Based on Petitioner's showing that he was denied his legal files, and in an attempt to conserve judicial resources, the Court shall assume Petitioner is entitled to equitable tolling until March 1999 based on his lack of access to his legal files.

4.    <u>Mental Incompetence</u>

Under some circumstances, a mental illness can represent an extraordinary circumstance justifying equitable tolling. <u>See</u> <u>Laws v. Lamarque</u>, 351 F.3d 919, 923 (9th Cir. 2003) (remanded to determine whether mental illness prevented petitioner from timely filing). In <u>Bills v. Clark</u>, 628 F.3d 1092 (9th Cir. 2010), the Court of Appeals for the Ninth Circuit determined that courts should use a two part test to evaluate the application of equitable tolling in cases where petitioner suffers from a mental impairment. <u>Id.</u>

> (1) First, a petitioner must show his mental impairment was an "extraordinary circumstance" beyond his control, see Holland, 130 S. Ct. at 2562, by demonstrating the impairment was so severe that either
>
>> (a) petitioner was unable rationally or factually to personally understand the need to timely file, or
>>
>> (b) petitioner's mental state rendered him unable personally to prepare a habeas petition and effectuate its filing. [Footnote omitted]

1

2   (2) Second, the petitioner must show diligence in pursuing the claims to the
    extent he could understand them, but that the mental impairment made it
3   impossible to meet the filing deadline under the totality of the circumstances,
    including reasonably available access to assistance. See id.

4   Bills, 628 F.3d at 1100.

5       A petitioner who "makes a good-faith allegation that would, if true, entitle him to

6   equitable tolling" may be entitled to an evidentiary hearing. Roy v. Lampert, 465 F.3d 964, 969

7   (9th Cir. 2006) (quoting Laws, 351 F.3d at 919). However, a district court is not obligated to

8   hold an evidentiary hearing to further develop the factual record, even when a petitioner

9   alleges mental incompetence, when the record is sufficiently developed, and it indicates that

10  the petitioner's mental incompetence was not so severe as to cause the untimely filing of his

11  habeas petition. Roberts v. Marshall, 627 F.3d 768, 773 (9th Cir. 2010).

12      Petitioner claims this Court is not foreclosed from considering the merits of his claims

13  because he suffered from mental ailments that rose to the level of extraordinary circumstances

14  justifying equitable tolling. He contends that mood swings, depression and anxiety attacks

15  were brought on as a result of his prolonged isolation in administrative segregation. (Pet. at

16  106-107; Opp'n. at 2, 5-6.) However, Petitioner has stated that "Due to the extensive treatment

17  and ameliorative effects of this psychotropic medication I have been able to gradually regain

18  my communicative and comprehensive skills and be fairly engaging with others." (Pet. at 107.)

19      Respondent has provided the Court with a copy of Petitioner's mental health record.

20  (LD 18.) Upon being admitted into administrative segregation placement a screening of

21  Petitioner's mental health was conducted.  It reflects a determination that Petitioner did not

22  suffer from a mental illness and that there was no need to send him to a mental health

23  professional. (Id. at 1-4.) Petitioner's mental health was again reviewed in March 1998, and

24  it was determined that Petitioner did not require mental health services. (Id. at 5-8.)

25      On April 14, 1999, Petitioner first requested psychiatric services. At that time Petitioner

26  complained of anxiety and sleeplessness. He denied experiencing any audio or visual

27  hallucinations and was found at that time to still have appropriate affect and thought

28  processes. (Id. at 12-13.) On May 19 and July 8, and October 12, 1999, Petitioner's mental

1   health condition was found not to be severe enough to include him in the mental health

2   services delivery system; he reported that he was doing well and that the medications were

3   working. (LD 18 at 11, 16-17, 19, 23-26.) While one mental heath screening record indicates

4   Petitioner was included in the Mental Health Delivery System on July 17, 1999, the  mental

5   health records indicate the existence of nothing more than slight agitation, anxiety and sleep

6   problems. (LDs 23-26.)

7          Petitioner's mental health records do not support the proposition that Petitioner was too

8   mentally impaired to challenge his conviction. Accordingly, Petitioner has not satisfied the first

9   prong of <u>Bills</u>, namely that his "impairment was so severe that either [he] was unable rationally

10  or factually to personally understand the need to timely file, or [his] mental state rendered him

11  unable personally to prepare a habeas petition and effectuate its filing." <u>Bills</u>, 628 F.3d at

12  1099-1100. Petitioner's claim of equitable tolling based on mental incompetence is denied.

13                   5.        <u>Abandonment by Legal Counsel</u>

14          Petitioner asserts in a declaration attached to his petition and in his opposition to the

15  motion to dismiss, that in May 1999 his mother hired Fresno attorney Thomas J. Richardson,

16  to file a federal petition for writ of habeas corpus and provided him all of his legal materials.

17  (Pet. at 107-108, ECF No. 2 at 10-12, Opp'n at 2-3, 6-7.) According to Petitioner, at no time

18  after  Richardson was hired and continuing until November 2007, did Richardson advise him

19  of the one year statute of limitations.  Instead he led Petitioner to believe that there was no

20  rush to file the petition  and that he was actively investigating and preparing the petition. (<u>Id.</u>)

21  Petitioner attached as exhibits copies of two receipts allegedly from his mother to Richardson's

22  office providing $8,000 for his services. (Pet. at 125.)

23          Petitioner asserts that during the time between 1999 and 2007, he and his family

24  routinely attempted to contact Richardson's office and were often told that Richardson was

25  unavailable or busy. When Richardson was actually contacted Petitioner asserts that he

26  always assured his family that he was working on the petition and that there was no statute

27  of limitations. (ECF No. 2 at 10.)

28          After becoming suspicious of the failure of the attorney to file a petition, Petitioner filed

1    a complaint with the California State Bar in December 2006. (Pet. at 107-108, ECF No. 2 at
2    10-12, Opp'n at 2-3, 6-7.)   An investigation was conducted, and Petitioner asserts that
3    Richardson was ordered to return his legal documents as well as the money for unperformed
4    services. In support of his allegations, Petitioner attached copies of a check from Richardson's
5    law office to Josefina Hernandez[6] sent on October 31, 2007 for $3,000 that was returned for
6    lack of sufficient funds, a receipt and acknowledgment of refund form for $4,000 from
7    Richardson's office to Ms. Hernandez dated November 29, 2007, and a January 23, 2008
8    letter from Laura Sharck, investigator from the California State Bar stating that the
9    investigation into the matter was complete and she had forwarded the case to California State
10   Bar deputy trial counsel for further action. (Pet. at 121-123.)

11       Petitioner asserts that he is entitled to equitable tolling as Richardson's "egregious"
12   conduct constitutes extraordinary circumstances that allow for equitable tolling of the statute
13   of limitations under Ford v. Hubbard, 330 F.3d 1086, 1106 (9th Cir. 2003) and Spitsyn v.
14   Moore, 345 F.3d 796, 801 (9th Cir. 2003).

15       Petitioner is correct that sufficiently egregious attorney misconduct may provide
16   sufficient grounds for equitable tolling. See Doe v. Busby, 661 F.3d 1001, 1012 (9th Cir. 2011);
17   Maples v. Thomas, 132 S. Ct. 912, 924 (2012) (We agree that, under agency principles, a
18   client cannot be charged with the acts or omissions of an attorney who has abandoned him.);
19   Holland v. Florida, 130 S. Ct. 2549, 2564 (2010); Mackey v. Hoffman, 2012 U.S. App. LEXIS
20   12925 (9th Cir., June 25, 2012) (holding abandonment of counsel as equitable grounds to
21   allow petitioner to file an untimely appeal from the district court's denial of his habeas petition.)

22       Based on the evidence presented to the Court, Petitioner may be entitled to equitable
23   tolling based on the conduct of Richardson. The fact that a state bar investigation was
24   conducted and Petitioner was refunded his payment provide strong support that counsel's
25   conduct was not 'garden variety' malpractice, but instead was a complete abandonment of
26   counsel, entitling Petitioner to equitable tolling.

27       Rather than conduct an evidentiary hearing to determine if Petitioner is entitled to

28

---

[6]It is assumed that Josefina Hernandez is Petitioner's mother.

1    equitable tolling[7], the court shall assume that Petitioner is entitled to equitable tolling from the

2    time Petitioner hired Richardson in May 1999, until Richardson provided Petitioner a refund

3    on November 29, 2007.

4         Even if Richardson's conduct prevented him from filing until some time in 2007,

5    Petitioner must show diligence in filing the petition after the fact. Spitsyn, 345 F.3d at 802 ("'[I]f

6    the person seeking equitable tolling has not exercised reasonable diligence in attempting to

7    file, after the extraordinary circumstances began, the link of causation between the

8    extraordinary circumstances and the failure to file is broken.'" (quoting Valverde v. Stinson,

9    224 F.3d 129, 134 (2d Cir. 2000))). Here, Petitioner was aware as of November 2007, when

10   Richardson refunded the payment, or at latest in January, 2008 when the California State Bar

11   completed its investigation, that he was no longer being represented by Richardson. However,

12   Petitioner did not proceed to file a state petition for post conviction relief until July, 2009, over

13   a year after he was aware that Richardson was no longer representing him. Accordingly, even

14   if afforded equitable tolling during the period that he was represented by Richardson, Petitioner

15   failed to act in a timely manner after he was aware that Richardson abandoned his case.

16   Petitioner's fifth ground for equitable tolling, even if granted, fails as Petitioner was not diligent

17   in filing for relief after the fact.

18        **F.     Actual Innocence as an Exception to the Statute of Limitations**

19        The United States Supreme Court has determined that a petitioner whose petition for

20   habeas corpus is procedurally barred may still obtain consideration of the merits of his petition

21   if he can establish his "actual innocence." Specifically, the Supreme Court, in Schlup v. Delo,

22   established an equitable exception to allow review of procedurally defaulted "constitutional

23   claims only if [petitioner] falls within the narrow class of cases . . . implicating a fundamental

24   miscarriage of justice." 513 U.S. 298, 314-315, 115 S. Ct. 851, 130 L. Ed. 2d 808 (citations

25   omitted.) A showing of actual innocence under Schlup is "not itself a constitutional claim, but

26   instead a gateway through which a habeas petitioner must pass to have his otherwise barred

27

28   _____

[7]Such an evidentiary hearing may be of little value in that according to the California State Bar website, Richardson is deceased.

1   constitutional claim considered on the merits." 513 U.S. at 315 (citing <u>Herrera v. Collins</u>, 506

2   U.S. 390, 404 (1993)).

3          This exception, equitable in nature, was created in light of the "concern about the

4   injustice that results from the conviction of an innocent person." <u>Schlup</u>, 513 U.S. at 325. "That

5   concern is reflected, for example, in the 'fundamental value determination of our society that

6   it is far worse to convict an innocent man than to let a guilty man go free.'" <u>Id.</u> (citing <u>In re</u>

7   <u>Winship</u>, 397 U.S. 358, 372 (1970) (Harlan, J., concurring)).

8          "To ensure that the fundamental miscarriage of justice exception would remain 'rare'

9   and would only be applied in the 'extraordinary case,' while at the same time ensuring that the

10  exception would extend relief to those who were truly deserving," the Supreme Court explicitly

11  limited the equitable exception to cases where a petitioner has made a showing of innocence.

12  <u>Schlup</u>, 513 U.S. at 321. "The Supreme Court did not hold that a petitioner may invoke <u>Schlup</u>

13  whenever he wants a trial do-over." <u>Lee v. Lampert</u>, 653 F.3d at 946 (Kozinski, J., concurring).

14         The Supreme Court has yet to determine whether the <u>Schulp</u> actual innocence gateway

15  applies to other procedural bars. However the Ninth Circuit in <u>Lee v. Lampert</u>, joined three

16  other circuit courts in holding that the equitable exception also applies to claims barred by

17  AEDPA's statute of limitations. 653 F.3d at 932 ("We hold that a credible claim of actual

18  innocence constitutes an equitable exception to AEDPA's limitations period, and a petitioner

19  who makes such a showing may pass through the <u>Schlup</u> gateway and have his otherwise

20  time-barred claims heard on the merits."). The Ninth Circuit found "[a]bsent evidence of

21  Congress's contrary intent, there is no articulable reason for treating habeas claims barred by

22  the federal statute of limitations differently" than claims involving procedural default. <u>Id.</u> (citing

23  <u>Souter v. Jones</u>, 395 F.3d 577, 599 (6th Cir. 2005)).

24         It is presumed "that Congress knew of the exception when it drafted AEDPA, and

25  absent the clearest command, we will not construe the statute to displace that equitable

26  authority." <u>Lee</u>, 653 F.3d at 934 (citing <u>Holland v. Florida</u>, 130 S. Ct. 2549, 2560-61 (2010)).

27  Strong equitable concerns outweigh other interests in allowing claims based on showings of

28  innocence to proceed:

As the [Supreme] Court warned in <u>Holland</u>:

> The importance of the Great Writ, the only writ explicitly protected by the Constitution, along with congressional efforts to harmonize the new statute with prior law, counsels hesitancy before interpreting AEDPA's statutory silence as indicating a congressional intent to close courthouse doors that a strong equitable claim would ordinarily keep open.

<u>Id.</u> at 2562 (internal citation omitted). It is difficult to imagine a stronger equitable claim for keeping open the courthouse doors than one of actual innocence, "the ultimate equity on the prisoner's side." <u>Withrow v. Williams</u>, 507 U.S. 680, 700, 113 S. Ct. 1745, 123 L. Ed. 2d 407 (1993) (O'Connor, J., concurring in part and dissenting in part) (noting that the Supreme Court "continuously has recognized that . . . a sufficient showing of actual innocence" is normally enough, "standing alone, to outweigh other concerns and justify adjudication of the prisoner's constitutional claim"). Indeed, "the individual interest in avoiding injustice is most compelling in the context of actual innocence." <u>Schlup</u>, 513 U.S. at 324.

<u>Lee</u>, 653 F.3d at 934-935.

Accordingly, if Petitioner can make a showing of actual innocence, that showing may implicate a fundamental miscarriage of justice entitling Petitioner to pass through the Schlup gateway and serve as an equitable exception to the AEDPA statute of limitations. In allowing the equitable exception, the courts have provided guidance regarding the relevant criteria for making a sufficient showing of "actual innocence."

> 1.   Credible New Evidence

The Supreme Court has required actual innocence gateway claims to be supported by credible "new reliable evidence . . . not presented at trial." <u>Schlup</u>, 513 U.S. at 324. The Supreme Court enumerated three specific categories of new reliable evidence: "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence." <u>Id.</u>

Assessing the reliability of new evidence is a typical fact finding role, requiring credibility determinations and a weighing of the probative force of the new evidence in light of the evidence of guilt adduced at trial. <u>House v. Bell</u>, 547 U.S. 518, 560 (2006) (Roberts, C.J., concurring in part and dissenting in part). The district court must act as a fact finder and determine if the new evidence presented is reliable. <u>Id.</u> at 557 ("As House presented his new evidence, and as the State rebutted it, the District Court observed the witnesses' demeanor, examined physical evidence, and made findings about whether House's new evidence was in fact reliable. This fact finding role is familiar to a district court. 'The trial judge's major role

1   is the determination of fact, and with experience in fulfilling that role comes expertise.'");

2   Anderson v. Bessemer City, 470 U.S. 564, 574 (1985)).

3                    2.       Scope of Evidence to be Considered

4       While Petitioner must present credible new evidence to pass through the Schlup actual

5   innocence gateway, he is not limited to presenting only the new evidence in making a showing

6   of innocence. With respect to an actual innocence gateway inquiry "Schlup makes plain that

7   the habeas court must consider all the evidence, old and new, incriminating and exculpatory,

8   without regard to whether it would necessarily be admitted under rules of admissibility that

9   would govern at trial." House v. Bell, 547 U.S. at 537-538 (citing Schlup, 513 U.S. at 327-328).

10                   3.       Petitioner's Burden of Proof

11      As the actual innocence gateway under Schlup is limited to extraordinary cases, a

12  petitioner must overcome a stringent standard of proof to qualify for the equitable exception.

13  "When a petitioner has been 'tried before a jury of his peers, with the full panoply of

14  protections that our Constitution affords criminal defendants,' it is appropriate to apply an

15  'extraordinarily high' standard of review." Schlup, 513 U.S. at 315-316 (citing Herrera, 506 U.S.

16  at 419, 426 (O'Connor, J., concurring). However, when a petitioner accompanies his claim of

17  innocence with an assertion of constitutional error at trial, his conviction may not be entitled

18  to the same degree of respect as one that is the product of an error-free trial. Id.

19      If a Petitioner "presents evidence of innocence so strong that a court cannot have

20  confidence in the outcome of the trial unless the court is also satisfied that the trial was free

21  of nonharmless constitutional error, the petitioner should be allowed to pass through the

22  gateway and argue the merits of his underlying claims." Schlup, 513 U.S. at 316. "[T]he

23  petitioner must show that it is more likely than not that no reasonable juror would have

24  convicted him in the light of the new evidence." Id. at 327. In other words, a petitioner must

25  show "that more likely than not any reasonable juror would have reasonable doubt." House,

26  547 U.S. at 538.

27      The Supreme Court noted that "[t]he word 'reasonable' in that formulation is not without

28  meaning." Schlup, 513 U.S. at 329. "It must be presumed that a reasonable juror would

consider fairly all of the evidence presented. It must also be presumed that such a juror would conscientiously obey the instructions of the trial court requiring proof beyond a reasonable doubt." Id.

"Because a Schlup claim involves evidence the trial jury did not have before it, the inquiry requires the federal court to assess how reasonable jurors would react to the overall, newly supplemented record." House, 547 U.S. at 538 (citing Schlup, 513 U.S. at 330). "If new evidence so requires, this may include consideration of the credibility of the witnesses presented at trial." Id.

> Based on this total record, the court must make a probabilistic determination about what reasonable, properly instructed jurors would do. The court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors.

House, 547 U.S. at 538 (internal quotation marks omitted) (citing Schlup, 513 U.S. at 329); Lee, 653 F.3d at 938.

"[T]he Schlup inquiry . . . requires a holistic judgment about 'all the evidence,' and its likely effect on reasonable jurors applying the reasonable-doubt standard." House, 547 U.S. at 539-40 (citing Schlup, 513 U.S. at 328-29). "As a general rule, the inquiry does not turn on discrete findings regarding disputed points of fact, and 'it is not the district court's independent judgment as to whether reasonable doubt exists that the standard addresses.'" Id. "Predicting what reasonable jurors would do is not easy. It's much harder than combing the record and picking at the state's case. But it's what Schlup demands." Carriger v. Stewart, 132 F.3d 463, 486 (9th Cir. 1997) (Kozinski, J., dissenting).

### 4.   Analysis

Petitioner presents two grounds upon which he asserts his innocence. First, Petitioner claims that new expert testimony shows that the bullets that struck the car ricocheted off the road beforehand. Petitioner asserts that the new expert theory "dismantles the prosecution's 'direct rifle fire' murder theory." (ECF No. 2 at 13-14.) Secondly, Petitioner provides documentation that one of the prosecution's witnesses was wanted for murder in Mexico, thereby undermining the witness' credibility. The Court shall address each claim in turn.

a.      Bullet Trajectory Expert Testimony

As described above, Petitioner provides declarations dated on October 7, 2008 and November 3, 2008  from James L. Norris, a criminalist, who reviewed the ballistics evidence from the trial. (ECF No. 1-1 at 10-31.) Norris concluded, that in his opinion, the shots were fired from a high powered rifle from approximately 190 feet behind the vehicle, and two shots ricocheted off the roadway, causing sparks, and then entered the rear of the vehicle at an upward angle. (Id.) The opinion of Norris directly contradicts the testimony of the prosecution's criminalist, John Hamman, who testified at trial that it was unlikely that the bullets ricocheted off the roadway before entering the vehicle. (Id.)

If Norris' testimony is correct, the bullets that entered the vehicle ricocheted off the road rather than directly entering the vehicle. Even if the bullets ricocheted, it is unclear how such evidence would implicate Petitioner's innocence. The evidence does not negate the evidence presented at trial that from where the other vehicle stopped, 24 shots were fired from a high powered rifle, two of which entered the victims' car, either directly or by ricochet, killing the victim. The expert opinion also does not undermine evidence presented that Petitioner lived at the compound, that Petitioner's neighbor stated that just after the incident Petitioner told him he had chased someone, and that Petitioner left town abruptly, including leaving his belongings, and last paycheck. (LD 2.) Additionally, at least two other witnesses testified that Petitioner confessed to killing someone or shooting at the victims car. (Id.)

The new evidence of bullet trajectory is not sufficient to make a showing of actual innocence. Taken in the best light, the fact that the bullets may have ricocheted could imply that Petitioner did not have the requisite intent to kill and should have been found guilty of manslaughter, not murder. This fails for two reasons. First, the evidence is not sufficient to sway a jury to finding Petitioner innocent in light of all of the other evidence. Of greatest note is that the evidence still shows that the shots were filed from a significant distance, over 190 feet away. At that distance, even if the bullet ricocheted off of the asphalt, the shots would still

1   have to be fired in the direction of the vehicle.[8] Since the bullets were likely still fired in the

2   direction of the vehicle, a jury could still easily find that Petitioner had the requisite intent to kill

3   the passengers of the vehicle.

4           As described above, at trial, defense counsel cross-examined the criminalist regarding

5   the direct fire theory and further argued during closing arguments that shots ricocheted before

6   hitting the vehicle. (See Rptr's Tr. at 359-363, 367, 1357-58.)  Despite being presented with

7   such arguments, the jury still found Petitioner guilty of murder and attempted murder. Even

8   if Petitioner had presented an expert, such as Norris, to provide an opinion regarding ricochet,

9   the jury would have to weigh the conflicting expert opinions. In light of the new evidence, it is

10  not reasonable to believe that a reasonable jury would more likely than not find Petitioner not

11  guilty under Schlup. The new evidence does not suggest that there was a different shooter,

12  remove Petitioner from the scene, or otherwise alter the theory of the murder. It only

13  undermines the accuracy of the shots fired at the vehicle.

14          While the following discussion of the California Appellate Court was directed towards

15  sufficiency of the evidence, it is equally applicable to the following issue of innocence.

16          The record contains more than enough evidence to justify the jury's
    finding that [Petitioner] intended to kill the teenagers who were not hit. [Petitioner
17  fired 24 rounds of copper-jacketed, steel bullets from an assault type weapon
    in the direction of the car in which the teenagers were riding. In our estimation,
18  this evidence alone warrants the guilty verdicts on counts 2 to 5. The fact that
    most of these shots missed the car changes nothing; the existence of the
19  required intent does not ride as a matter of law upon the marksmanship of the
    shooter. In fact, however, two shots did hit the car, which provides more support
20  for the verdicts. Further justification for the verdicts is found in the testimony of
    the prosecution's expert, who said that it was unlikely the two recovered bullets
21  had ricocheted. The jury was entitled to rely upon this opinion to conclude
    [Petitioner] was not intentionally shooting at the ground but was instead
22  purposely directing his fire at the car and its occupants.

23  (Lodged Doc. 2 at 8-9.)

24          Even in light of new expert testimony challenging whether the bullets ricocheted before

25

26          [8] The Court is cognizant that issues of exact bullet trajectory are to be left to qualified experts. Regardless,
27  reasonable jurors, using common sense principles, could surmise that bullets fired from nearly 200 feet away that
    ricocheted off the roadway and into the vehicle, would indicate that the shooter was either aiming at the vehicle
28  or within close proximity of the vehicle.

1  hitting the car, the state court aptly points out that "the existence of the required intent does

2  not ride as a matter of law upon the marksmanship of the shooter." (Id.) Based on all of the

3  evidence, old and new, a reasonable jury could conclude that the shots were fired in a

4  sufficiently close proximity to the vehicle to infer an intent to kill the occupants. Petitioner has

5  not made a sufficient showing of actual innocence to pass through the Schlup gateway.

6       Secondly, even if the new evidence negated a reasonable jury's finding of intent to kill,

7  Petitioner's actual innocence claim fails. In order for barred claims to pass through "Schlup's

8  gateway," Petitioner must establish his factual innocence of the crime, and not mere legal

9  insufficiency. See Bousley v. United States, 523 U.S. 614, 623 (1998); Jaramillo v. Stewart,

10 340 F.3d 877, 882-83 (9th Cir. 2003). Even if Petitioner could convince a jury that he lacked

11 the intent to kill, it does not prove his factual innocence, instead it just reduces Petitioner's

12 level of culpability. If Petitioner lacked the intent to kill, it is most likely that firing shots at the

13 car would have been done with reckless indifference and Petitioner would be guilty of a lesser

14 included offense such as manslaughter. The Schlup miscarriage of justice exception to the

15 statute of limitations requires factual innocence, and Petitioner's lesser showing of culpability

16 is not adequate grounds for allowing Petitioner to pass through the gateway.

17                    b.       Evidence that Prosecution's Witness was Wanted for Murder

18       Petitioner also claims that he discovered in March 2009 Mexican documentation that

19 a witness for the prosecution, Verdugo,  was wanted for murder at the time he testified against

20 Petitioner. (See Opp'n. at 3.) Petitioner argues that such evidence could have been used to

21 attack Verdugo's credibility at trial.

22       First, it should be noted that Petitioner attempted to raise the issue of Verdugo's

23 criminal history at trial. Defense counsel attempted to cross-examine Verdugo regarding the

24 murder. (Rpt'rs Tr. at 384.) Petitioner appealed the trial court's decision to deny the evidence

25 on relevance grounds, and the California Court of Appeal, Fifth Appellate District denied the

26 claim. (LD 2 at 13-18.)

27       Secondly, the evidence, even if considered new, does not prove Petitioner's innocence.

28

Again, the evidence does not negate any of the physical evidence from the crime scene. Even without Verdugo's testimony, significant other circumstantial evidence was presented at trial that is not affected by Verdugo's credibility.

At trial, Petitioner's neighbor at the compound, Gaeta, testified that he saw a car turn around in the compound, heard shots fired, and called the sheriff. (LD 2 at 4.) He tried to call Petitioner, but Petitioner's girlfriend, Mendoza, told him Petitioner was not home. Five minutes later, Petitioner knocked at Gatea's door and told Gaeta he had just chased somebody. (LD 2 at 4-5.) Gaeta did not inform the sheriff of the conversation right away because he was scared of Petitioner. Later, Gaeta attempted to wear a body wire and listening device when meeting with Petitioner, but Petitioner did not repeat his statements regarding chasing a car.

Over a month after the incident, the sheriff's office interviewed Petitioner, and told him that they would be interviewing his girlfriend several days later. When the sheriffs arrived to interview his girlfriend, they had discovered that they both had abruptly left, leaving behind belongings and Petitioner's last paycheck. (LD 2 at 4-7.)

Verdugo gave Petitioner and his girlfriend a ride to Indio, California. According to Verdugo, Petitioner told him he had killed someone in Madera and that he had his brother hide the murder weapon. Verdugo testified that he had agreed to cooperate with the prosecution as a part of plea agreement under which he admitted that he had been an accessory after the fact. (Id.)

Petitioner's brother also entered into a plea bargain at trial that he had disposed of the weapon from Petitioner. He also admitted as part of the plea bargain that his brother admitted to shooting the victim. At trial, Petitioner's brother attempted to claim he did not understand the agreement and denied making the statements. Petitioner's brother's attorney testified that the plea agreement was read to his client and changes to the agreement were made at his client's request. (Id.)

Investigators found Petitioner's girlfriend, Mendoza, in Thermal, California. She told the investigators four different stories. Finally, she admitted that Petitioner told her that he had

shot at the victim's car and killed someone. Mendoza also entered into a plea agreement, which she too attempted to recant at trial. Her attorney testified that the agreement was fully explained to her, that she understood it, and acknowledged that the statements she made were truthful. (Id.)

In April, 1994, Petitioner traveled to Wapato, Washington, and moved in with Galindo. He admitted to Galindo that he had shot and killed someone and had disposed of the weapon. Galindo contacted the authorities and assisted them in capturing Petitioner. (LD 2 at 4–7.)

As described above, significant evidence, including Petitioner's confession to multiple individuals was presented at trial. Even if Verdugo's testimony was completely undermined, the remaining evidence presented against Petitioner strongly weighs in favor of his guilt. Petitioner has not made a sufficient showing of actual innocence under Schlup, and his claims remain barred by the statute of limitations.

**III.    CONCLUSION**

As explained above, Petitioner failed to file the instant petition for Habeas Corpus within the one year limitation period required by 28 U.S.C. § 2244(d). Petitioner was not entitled to a later commencement of the statute of limitations period. Petitioner is also not entitled to the benefit of statutory tolling, as his post conviction filings were filed after the statute of limitations period expired. Petitioner may be entitled to equitable tolling, but was not diligent in timely filling the petition after the extraordinary circumstances no longer prevented him from proceeding with his claims. Finally, Petitioner has not made a sufficient showing of actual innocence to create an equitable exception to the statute of limitations. Based on the foregoing, this Court recommends that Respondent's motion to dismiss be GRANTED.

**IV.    RECOMMENDATION**

Accordingly, the Court HEREBY RECOMMENDS that the motion to dismiss for Petitioner's failure to comply with 28 U.S.C. § 2244(d)'s one year limitation period be GRANTED.

This Findings and Recommendation is submitted to the assigned United States District

1  Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 304 of the

2  Local Rules of Practice for the United States District Court, Eastern District of California.

3  Within thirty (30) days after the date of service of this Findings and Recommendation, any

4  party may file written objections with the Court and serve a copy on all parties.  Such a

5  document should be captioned "Objections to Magistrate Judge's Findings and

6  Recommendation."  Replies to the Objections shall be served and filed within fourteen (14)

7  days after service of the Objections.  The Finding and Recommendation will then be submitted

8  to the District Court for review of the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636

9  (b)(1)(c).  The parties are advised that failure to file objections within the specified time may

10  waive the right to appeal the Order of the District Court.  Martinez v. Ylst, 951 F.2d 1153 (9th

11  Cir. 1991).

12

13  IT IS SO ORDERED.

14  Dated:    July 18, 2012                          /s/ Michael J. Seng
                                                    UNITED STATES MAGISTRATE JUDGE

15

16

17

18

19

20

21

22

23

24

25

26

27

28